## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **EDITH SUZANNE ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:08-cv-884** |
| | ) | **Judge Trauger** |
| **THE AT&T DISABILITY INCOME** | ) | |
| **PROGRAM,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the court are cross-Motions for Judgment in an ERISA case (Docket Nos.
20 & 21). For the reasons discussed herein, the Motion for Judgment filed by the defendant will
be denied, and the Motion for Judgment filed by the plaintiff will be granted.

## BACKGROUND

Bell South Telecommunications, Inc. employed Edith Suzanne Allen for thirty-one years,
most recently as a circuit provisioning area manager. (Docket No. 18-1 at 46, 208.) Bell South
Telecommunications, Inc. provided some of its employees with a disability benefits plan through
the AT&T Disability Income Program ("AT&T"). (Docket No. 20-1.) The summary plan
description ("Plan") governed the terms of these benefits. (*Id.* at 3.) AT&T sponsored the Plan,
but it delegated its authority as claims administrator to Sedgwick Claims Management Services
("Sedgwick"). (*Id.* at 70.) As claims administrator, Sedgwick had the discretion to interpret the
Plan and determine whether a particular employee was entitled to benefits. (Docket No. 18-1 at
42.)

1

# I.      The Plan

The Plan provides that short-term disability benefits are available for total disability and partial disability.  (Docket No. 20-1 at 9.)  Under the Plan, an individual is considered totally disabled where, "because of Illness or Injury [the individual is] unable to perform all of the essential functions of [his or her] job or another available job assigned by [the individual's] Participating Company with the same full-time or part-time classification for which [the individual is] qualified."  (*Id*. at 11.)  An individual is considered partially disabled where he or she cannot perform all of the essential functions of his or her job for the same number of regularly scheduled hours.  (*Id*.)  In order to be eligible for short-term disability benefits, an employee must, among other things, "[b]e under the care of a Physician and follow his or her recommended treatment plan."  (*Id*. at 12.)

With respect to documentation, "the Claims Administrator will require that [the claimant] periodically furnish satisfactory Medical Documentation of [his or her] disability from [his or her] Physician."  (*Id*.)  Furthermore, the administrator reserves the right to require that an employee undergo a medical examination by a physician designated by the administrator, "if the Claims Administrator requires this examination to continue [] Short-Term Disability Benefits." (*Id.*)  Failure to cooperate in such a medical examination is grounds for discontinuance of benefits.  (*Id.* at 31.)

# II.     Ms. Allen's Initial Diagnosis and Treatment

While working at Bell South Telecommunications, Inc., Ms. Allen began experiencing physical and emotional stress related to her work assignments and the care she provided to her ill mother.  (Docket No. 18-1 at 26.)  Prior to Ms. Allen's claim for disability, she took time off

from work pursuant to the Family Medical Leave Act in order to care for her mother. (*Id.* at 26, 200.) Ms. Allen first reported absent from work due to disability on February 12, 2008, at which point Sedgwick began processing Ms. Allen's short-term disability claim.[1] (*Id.* at 2.) The same day, Allen met with Cynthia Fry, a licensed clinical social worker.[2] (*Id.* at 58.) Ms. Fry recommended that Ms. Allen take some time off of work, "in order to stabilize," and see her primary care physician, Dr. James Lancaster. (*Id.*) Ms. Fry notified Dr. Lancaster of her recommendation and requested that he evaluate Allen. (*Id.*) Ms. Fry also referred Ms. Allen to Dr. Lucas Van Orden, a psychiatrist. (*Id.*)

On February 25, Ms. Allen visited Dr. Lancaster to discuss her depression and current psychiatric medication. (*Id.* at 25.) Dr. Lancaster noted that Ms. Allen complained of headaches and trouble sleeping, and observed that she was, emotionally, "a mess." (*Id.* at 26.) Dr. Lancaster wrote that, while Ms. Allen had a lot of stress related to her mother's care, "her work is causing as much or more stress at this time." (*Id.*) He recorded a past medical history of insomnia, depression, and anxiety. (*Id.* at 26-27.) During the visit, Dr. Lancaster observed that Ms. Allen exhibited a tearful affect, fragmented thought processes, and tremulousness. (*Id.* at 28.) He diagnosed Ms. Allen with reactive depression, moderately severe, and he recommended that she take a leave from work and seek psychiatric consultation. (*Id.* at 28.) He also doubled the dosage of her anti-depressant to 10 milligrams daily and prescribed medication for insomnia. (*Id.*) He wrote a letter to Sedgwick stating that he agreed with Ms. Fry's recommendation that

---

[1]All of the relevant factual events occurred in 2008.

[2]The record suggests that Ms. Allen located Ms. Fry through AT&T's employee assistance program.

3

Ms. Allen take time off from work for anxiety and depression, and he attached his clinical notes.[3] (*Id*. at 25-28.)

On February 28, Ms. Allen met with Dr. Van Orden, who filled out the disability evaluation form supplied by Sedgwick. (*Id.* at 19.) Dr. Van Orden checked the boxes which indicated that Ms. Allen's cognitive functioning was normal, including her capacity to follow directions and to focus. (*Id*. at 24.) He checked the boxes indicating that Ms. Allen had reported that she was able to clean her residence, perform routine shopping, drive, and pay bills. (*Id*.) Dr. Van Orden described her emotional state during the examination as anxious and worried, but noted that she was able spontaneously to compose herself. (*Id*.) With respect to behavioral observations, Dr. Van Orden observed that, while appropriately dressed and groomed, Ms. Allen's impulse control indicated a "very irritable, unstable mood." (*Id*.) He reported that she had suicidal ideations, but had not reported any plan to commit suicide. (*Id.* at 20.)

Dr. Van Orden described Ms. Allen as self-reporting no current ability to perform work activities in any capacity, socialization problems, and sleep disturbances that persisted, despite use of the sedative prescribed by Dr. Lancaster. (*Id*.) Dr. Van Orden recorded that Ms. Allen reported panic attacks with chest discomfort, fear, and hyperventilation occurring two to three times per week, for up to three or four hours at a time. (*Id.* at 24.) Under the form's "Diagnostic Impressions" section, Dr. Van Orden checked off the following "areas as barriers in returning to work": increase in work demands, recent unfavorable work evaluation, conflicts with supervisor,

---

[3]Dr. Lancaster declined to fill out the disability evaluation form provided by Sedgwick, stating it was "more appropriate for the psychological evaluation than for my own in primary care setting. That setting allows for more detailed evaluation of the emotional functioning and behavioral observations required. I hope my note will be of assistance." (*Id.* at 25.)

4

and dissatisfaction with job. (*Id.* at 20.) Dr. Van Orden described Ms. Allen as suffering from major depressive disorder, recurrent, moderate and carrying a Global Assessment of Functioning ("GAF") score of 30.[4] (*Id.*) Dr. Van Orden increased the dosage of Ms. Allen's anti-depressant to 40 milligrams daily and recommended weekly psychotherapy and another visit in two weeks. (*Id.*) Dr. Van Orden recommended that Ms. Allen stay home from work because she was "emotionally unstable" and "not competent" and could not perform the essential duties of her job or of any job. (*Id.* at 20, 24.) He wrote that he was unable to determine when she could return to work. (*Id.* at 20.)

### III.    Dr. Grimes' Review and Sedgwick's Initial Denial of Benefits

On March 5, Sedgwick notified Ms. Allen that her request for benefits had been denied.[5] (*Id.* at 46.) Sedgwick concluded that

> based on the fact that as of the date of this letter, the medical information received does not establish your inability to perform your job [] with or without reasonable accommodations . . . . [Integrated Disability Service Center] physician Dr. Kathleen Grimes completed a peer review of your case on March 5, 2008. Dr. Grimes spoke to Dr. Van Orden on March 5, 2008. Per your Dr. Orden [*sic*] he is unable to determine the extent of your impairments based on one office visit. Dr. Grimes documented the following findings, "The available medical information does not

---

[4]According to the Diagnostic and Statistical Manual of Mental Disorders, 4th edition, text revision ("DSM-IV"), a GAF Score of 21-30 corresponds to behavior considered influenced by delusions or hallucinations; or serious impairment in communications or judgment; or inability to function in all areas. A score of 31-40 corresponds to some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood.

[5]Previously, on February 28, Sedgwick notified Ms. Allen that it would deny disability benefits because of Ms. Allen's failure to submit additional medical information. However, Sedgwick appears to have received Ms. Allen's medical records at some point that day and initiated a peer review. The parties do not discuss the February 28 letter denying benefits at any length, and the court will not consider it further.

> clearly substantiate significant functional impairment, that would preclude her ability
> to perform her own occupation."

(*Id.* at 46-47.)  Although the letter characterizes Dr. Grimes as a physician, the record suggests

that she was not a physician within the Plan's definitions.[6]  (*Id.* at 47.)  The letter did not

mention Ms. Fry or Dr. Lancaster and contained instructions for appeal.  (*Id.* at 46-47.)

Dr. Grimes' note, as recorded in Sedgwick's claim diary, shows that she spoke with Dr.

Van Orden but was unable to speak with Ms. Fry.[7]  With respect to Dr. Van Orden, Dr. Grimes

reported that "he stated that it is difficult for him to give an opinion on whether she can [return to

work] b/c he has only seen her once and reported that it was possible that she might be

malingering/exaggerating her [problems] as she asked him a/b disability at the [initial office

visit]."  (*Id.* at 180.)  Dr. Grimes also noted that, according to Dr. Van Orden, Ms. Allen "is

seeing Cynthia Fry who he indicated was a good therapist, but her [last office visit] w/ her was

apparently 3 weeks prior to his [initial office visit] . . . (early 2/08).  [Dr. Van Orden] thinks that

she cannot work at her particular work site, but may be able to perform some other less stressful

position at a different place . . . ."  (*Id.*)

---

[6]Dr. Grimes signed her note as "Kathleen Grimes, Ph.D." and "GA Licensed
Psychologist."  (Docket No. 18-1 at 182.)  The note's title is "Physician Review."  (*Id.* at 176.)
The Plan defines physician as: "[a]n individual duly licensed to prescribe and administer drugs
and medicines or to perform surgery.  Physician will also include. . . a chiropractor or
psychologist referred by a licensed Physician or licensed psychiatrist as part of an ongoing
treatment plan of the licensed Physician or licensed psychiatrist."  (Docket No. 20-1 at 40-41.)
There is no suggestion whatsoever that Dr. Grimes participated in Ms. Allen's treatment plan.
AT&T's memorandum in support of its motion correctly characterizes Dr. Grimes as a
psychologist, rather than a physician.  (Docket No. 20-3 at 11.)

[7]Dr. Grimes called Ms. Fry on February 29, but could not leave a message because the
voice-mailbox was full.  On March 5, Dr. Grimes again called Ms. Fry, but Ms. Fry's outgoing
message indicated that Ms. Fry was out of the office on Wednesdays.  That day, Dr. Grimes
wrote her note.

Dr. Grimes concluded that the available medical information did not reflect an impairment that would preclude Ms. Allen from performing her job, stating, "[s]he has no significant impairment in her cognitive functioning or ability to manage her [activities of daily living]." (*Id.* at 182.) Dr. Grimes stated that "no behavioral abnormalities were noted." (*Id.*) Furthermore, Dr. Grimes noted that, along with Dr. Van Orden's statement about the possibility of symptom-exaggeration or malingering, there was "some indication that she might not be actively engaged in [treatment]. She reportedly saw her therapist 3 weeks prior to her [initial office visit] with the psychiatrist. Ongoing psychotherapy at least 2x/month is the standard of care for an impairing condition." (*Id.*) Finally, Dr. Grimes stated that it appeared "work-related factors are contributing to her current [leave of absence] from work as her MD indicated that her current psychiatric [problems] were triggered by her demotion at work." (*Id.*)

There is no indication that Dr. Grimes contacted Dr. Lancaster, and the record is not entirely clear as to whether she had access to his contact information or examination notes. Dr. Grimes recorded current treatment providers as "Lucas Van Orden, MD, psychiatry, and Cynthia Fry, therapist," and Dr. Lancaster's opinion is not discussed anywhere in the record of Ms. Allen's initial disability determination. (*Id.* at 178.)

## IV. Ms. Allen's Continuing Treatment and Appeal

Ms. Allen continued to see Ms. Fry. (*Id.* at 64.) On March 10, Ms. Fry emailed Dr. Van Orden and reported that Ms. Allen "has not been cleaning, shopping, paying bills, and is isolating. She has obsessional thinking and increased fear." (*Id.*) Ms. Fry stated that Ms. Allen could only complete two steps of a three-step command without redirection, and that Ms. Allen's "ability to compose herself was minimal. She was uncontrollably tearful and has a diminished

7

ability to make decisions." (*Id.*) Ms. Fry described Ms. Allen as having experienced an increase

in anxiety, irritability, and depression. (*Id.* at 64.) On March 17, Ms. Fry sent a letter to

Sedgwick describing Ms. Allen's therapy sessions, which had taken place weekly since February

12:

> As time has moved on she has deteriorated further and has episodes of uncontrollable
> crying with great difficulty composing herself. She has to be frequently redirected
> to remain on task. She can perform serial 3's but not 7's. She can follow two of a
> three step command. After being requested to write a sentence from dictation she
> was able to complete the task after four redirects . . . . Her judgment is less than
> stable at this point. Ms Allen has become isolated and does not perform activities
> she used to enjoy such as golf. She has become unable to clean her residence
> without assistance and avoids activities such as grocery shopping. She does prepare
> simple meals for herself and her mother . . . . Ms. Allen remains unstable and unable
> to perform work duties as she is still having her medications changed and adjusted
> as she remains in therapy.

(*Id.* at 57.)

On April 1, Ms. Allen appealed the benefits denial, noting that Dr. Lancaster had never

been contacted and that she had continued to see Ms. Fry weekly for therapy and Dr. Van Orden

biweekly for medication management. (*Id.* at 56-57.) On April 29, Sedgwick sent her a letter,

noting that it had received her appeal. (*Id.* at 74.) The letter stated that her eligibility for

benefits "will be determined under the following Plan provision(s):" and provided language not

found in the Plan. Among other things, the language in Sedgwick's letter defines disability as "a

medical condition supported by objective medical evidence, which (1) makes a Participant

unable to perform any type of work as a result of a physical or mental illness . . ." (*id.*), in

contrast to the Plan's definition of total disability as a situation in which, "because of Illness or

Injury [the individual is] unable to perform all of the essential functions of [his or her] job or

another available job assigned by [the individual's] Participating Company . . . ." (Docket No.

20-1 at 11).  On May 1, Ms. Allen contacted Sedgwick to confirm that she was visiting Ms. Fry weekly and Dr. Van Orden bi-weekly.  (18-1 at 170.)

On May 8, Sedgwick sent a letter once again declining Ms. Allen's application for short-term disability benefits.[8]  (*Id.* at 90.)  In contrast to the appeal-instruction letter, this letter used the Plan's language in defining disability.  (*Id.*)  The May 8 letter stated that two independent physician advisors had reviewed the claim and concluded that Ms. Allen was not disabled.  (*Id.* at 94.)  Dr. Nelson Chao, an internal medicine specialist, had consulted with Dr. Lancaster and concluded that, from an internal medicine standpoint, Ms. Allen was not disabled.  (*Id.* at 90.)  The other independent physician advisor, Dr. Irwin M. Greenberg, a psychiatrist, unsuccessfully attempted to contact Ms. Fry and Dr. Van Orden.[9]  Instead, Dr. Greenberg simply restated the chronology of Ms. Allen's treatment as reflected in her medical records and concluded

> [there are] no objective findings of bona fide psychiatric disorder found in the available documentation as of 2/19/08 forward.  The documentation notes periodic findings of tremulousness and "fragmented" thinking noted by the [primary care physician] on one occasion.  On another occasion the therapist reported difficulty taking a sentence from dictation and only comp[l]eting 2 steps of a 3-step command.

---

[8]Sedgwick's letter erroneously informed Ms. Allen that she was entitled to a second appeal.  When Ms. Allen submitted this second appeal with updated, additional medical information, Sedgwick informed her of its mistake.  The court will not consider the information filed by Ms. Allen in her second appeal because this information was not part of the record at the time of Sedgwick's final decision.

[9]Dr. Greenberg noted that he attempted to contact Dr. Van Orden and Ms. Fry after 5 pm on Thursday, May 1.  (Docket No. 18-1 at 79.)  He left messages asking them to return his call by 2:30 on Friday, May 2.  (*Id.*)  Ms. Fry did not call back on May 2, and, on May 6, Dr. Greenberg again tried to call her, at 8:50 am.  (*Id.*)  He was unable to leave a message due to a full voicemail box, and submitted his report at some point before 10:30 that morning.  (*Id.*)  Dr. Van Orden returned Dr. Greenberg's call on the evening of May 1, but did not have access to Ms. Allen's chart.  (*Id.*)  Dr. Greenberg reported that "Dr. Van Orden specifically stated that he planned on calling me, and that I should not call him because it would be too difficult to get direct access to him.  (*Id.*)  Dr. Van Orden had not called back by 5pm on 5/02/08."  (*Id.*)

9

These findings appear to be related to Ms. Allen's problems reconciling her mother's needs to those of the workplace and did not appear to be expressions of bona fide psychiatric disorder . . . .

(*Id.* at 85.)  Dr. Greenberg characterized Ms. Fry's reports as the "only objective findings which could be considered as being induced by psychiatric disorder . . . . These findings appear to have been found on one occasion, probably on 3/10/08, although it might have been found on 3/17/08."  (*Id.*)  Furthermore, Dr. Greenberg noted that the "available documentation does not contain any progress notes written by Ms. Fry, and it is therefore not clear when subjective findings were reported and how often objective findings were observed."  (*Id.* at 82.)  Dr. Greenberg concluded that

[t]he documentation frequently notes that Ms. Allen had increasing difficulty at work because she had to be out of work to take care of her mother.  The findings noted, therefore, are not clearly attributable to psychiatric disorder, but appear to be expressions of anger and frustration at her employer for not accommodating her to a greater extent . . . but there is no description of actual cognitive disturbance in concentration, memory, attention, or in psychomotor activity . . . .  The absence of objective findings of bona fide psychiatric disorder . . . indicates there is insufficient information to support any negative impact on Ms. Allen's ability to function at her job during that time as a consequence of bona fide psychiatric disorder . . . .

(*Id.* at 85-86.)

The appeal rejection letter reflected Dr. Greenberg's and Dr. Chao's findings and noted that, "[i]n addition, you were reportedly described as taking care of your mother . . . [t]here does not appear to have been any doubt that you would be unable to perform these functions because of psychiatric disorder.  This would imply that your cognitive, organizational, and motor functioning were intact."  (*Id.* at 126.)

Having exhausted her administrative remedies, Ms. Allen filed a timely complaint against AT&T on September 17, 2008.  (Docket No. 1.)

10

## ANALYSIS

Ms. Allen alleges that Sedgwick's decision to deny her request for short-term disability benefits was arbitrary and capricious and that this decision was in violation of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.* AT&T denies that Sedgwick's decision was arbitrary and capricious. Both parties have moved for judgment on the record.

### I. Standard of Review

A court's review of an ERISA claim is limited to the administrative record as it existed when the plan administrator made its final decision. *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378-79 (6th Cir. 2005). The court must render findings of fact and conclusions of law based solely on a review of the administrative record. *Wilkins v. Baptist Health Care Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring and providing the opinion of the court with respect to the standard of review). The court may "consider evidence outside the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part." *Id.* However, courts may consult sources which are necessary to interpret the record. *See, e.g.*, *Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 616 (6th Cir. 2006) (consulting a medical dictionary to interpret a note in the claimant's record); *Gough v. Metro. Life Ins. Co.*, No. 3:03-0158, 2003 U.S. Dist. LEXIS 25252, at *6 (M.D. Tenn. Nov. 21, 2003) (using the Diagnostic and Statistical Manual of Mental Disorders to interpret the administrative record).

11

A denial of benefits challenged under ERISA is subject to *de novo* review unless the benefits plan gives the administrator discretionary authority in interpreting the plan and determining employee eligibility. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). When a plan administrator has such discretionary authority, a court reviews a decision to deny benefits under the arbitrary and capricious standard. *See id.*; *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir. 1996).

In the present case, AT&T and Ms. Allen are correct in their agreement that the Plan language mandates that the court use the arbitrary and capricious standard of review. In relevant part, the Plan states:

> The Claims administrator has been delegated authority by the Plan Administrator to determine whether a particular [employee] is entitled to benefits under the program. This includes the authority to determine claims and appeals . . . . The Plan Administrator . . . will have sole discretion to interpret the Program, including, but not limited to, interpretation of the terms of the Program, determination of coverage and eligibility for benefits, and determination of all relevant factual matters. Any determination made by the Plan Administrator or any delegated third party will not be overturned unless it is arbitrary and capricious.

(Docket No. 18-1 at 42.) Here, the administrator has been given the discretion to determine eligibility and benefits, and the court will review the administrator's decision under the deferential arbitrary and capricious standard. *See Firestone*, 489 U.S. at 115.

"While the arbitrary and capricious standard is the least demanding form of judicial review of administrative action, it is not a rubber stamp for the administrator's determination." *Smith v. Health Servs. of Coshocton*, 314 Fed. App'x 848, 854 (6th Cir. 2009) (citing *Elliot*, 473 F.3d at 617). A court must review "the quantity and quality of the medical evidence and the opinions on both sides of the issue" to determine whether a reasoned explanation exists to support an administrator's decision. *McDonald v. W.-S. Life Ins. Co.*, 347 F.3d 161, 172 (6th

12

Cir. 2003). Under this standard, the administrator's decision should be upheld if it is determined to be "rational in light of the plan's provisions." *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 984 (6th Cir. 1991). The validity of a claim to benefits under an ERISA plan is, thus, "likely to turn on the interpretation of terms in the plan at issue." *Firestone*, 489 U.S. at 115.

When analyzing whether an administrator's decision was arbitrary and capricious, a court should consider a potential conflict of interest arising when a plan administrator both evaluates claims for benefits and pays benefits claims. *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343, 2346 (2008). Furthermore, such a conflict may exist to the extent that a company may be inclined to contract with an administrator more likely to deny claims. *Id.* at 2350. In addition, "a plan administrator, in choosing the independent experts who are paid to assess a claim, is operating under a conflict of interest that provides it with a clear incentive to contract with individuals who are inclined to find in its favor that [a claimant] was not entitled to continued benefits." *Kalish v. Liberty Mut./Liberty Life Assur. Co.*, 419 F.3d 501, 508 (6th Cir. 2005) (citation and quotation omitted). Any potential conflict of interest does not change the standard of review, but is a factor to consider in determining whether an administrator's decision was arbitrary and capricious. *Glenn,* 128 S. Ct. at 2350. No allegation of a conflict of interest has been made in this case, and the record shows that the Plan was funded through a trust rather than an insurance policy (Docket No. 20-1 at 67), preventing one potential conflict of interest, *see Calvert v. Firstar Fin., Inc.*, 409 F.3d 286, 292 (6th Cir. 2005).

## II.    Sedgwick's Basis for Its Initial Denial was Arbitrary and Capricious

The proper inquiry in a disability benefits determination is to apply relevant medical evidence to the occupational standard set forth in a plan. *See Elliott*, 473 F.3d at 618. Logically,

13

an administrator can make a reasoned judgment only if it relies on medical evidence that assesses a claimant's ability to perform job-related tasks. *See id.* "[P]ut differently, medical data, without reasoning, cannot produce a logical judgment about a claimant's work ability." *Id*. Thus, when a plan defines disability with respect to a claimant's job duties, the administrator may need to identify those duties in order to make a reasoned determination. *See Donnelly v. Guarantee Mut. Life Co.*, No. 98-3266, 1999 U.S. App. LEXIS 8736, at *6 (6th Cir. May 4, 1999) (finding that an administrator was required to engage in a "factfinding process" in order to determine the claimant's job duties and potential disability). The discretion to interpret a plan's provisions includes determining a claimant's job description and the source of that determination. *See Osborne v. Hartford Life & Accident Ins. Co.*, 465 F.3d 296, 299 (6th Cir. 2006), *cert denied*, 128 S. Ct. 46 (2007). While a physician is "under no obligation to undergo a full-blown vocational evaluation" of a claimant's job, he or she may not base a disability determination solely on his or her own notion of what someone with the claimant's job description does. *McDonald*, 347 F.3d at 172 (citing *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998)).

Sedgwick never undertook the appropriate inquiry for determining whether Ms. Allen was entitled to disability benefits. The Plan requires that a short-term disability benefits recipient be unable to perform "all of the essential functions of [her] job or another available job." (Docket No. 20-1 at 11-12.) In the present case, the administrative record does not contain a description of Ms. Allen's duties as circuit provisioning area manager, let alone an analysis of

14

whether Ms. Allen could perform those duties.[10]  Thus, while Dr. Van Orden's conclusion that

Ms. Allen could not perform the functions of *any* job may be relevant, Dr. Grimes' conclusion

that Ms. Allen does not suffer from "significant functional impairment, that would preclude her

ability to perform her own occupation" (Docket No. 18-1) lacks persuasive force without some

indication that Dr. Grimes considered the specific requirements of Ms. Allen's occupation.  *See*

*Elliott*, 473 F.3d at 619 (noting that a physician never discussed a claimant's job duties, "which

implies that he did not conduct a reasoned evaluation of her condition to determine whether she

could perform those duties").

A close review of Sedgwick's diary log reveals that, based on a February 12th phone call,

a Sedgwick employee recorded Ms. Allen's job duties as "[s]it, talk, type."  (Docket No. 18-1 at

208.)  However, the same entry included a height of "999" and weight of "999," along with other

indications that it may be part of a cursory script.  Regardless, the  parties do not discuss this

entry in their briefs, it does not appear in any medical records, and the "Area Manager" portion

of Ms. Allen's job title suggests that her duties may have involved more than simply sitting,

talking, and typing.  Ms. Allen's GAF score, assigned by Dr. Van Orden on her initial visit,

corresponds to behavior considered influenced by delusions or hallucinations; or serious

impairment in communications or judgment; or inability to function in all areas.  Common sense

dictates that Ms. Allen's job title alone, "Circuit Provisioning Area Manager," would require

certain judgment and communication skills inconsistent with this GAF score.

---

[10]Ms. Allen's motion for judgment discusses the details of the job description "as
outlined in her Specific Job Description" (Docket No. 22 at 2), but the court will not consider
this information because it is not part of the administrative record, *see Wilkins*, 150 F.3d at 619.

AT&T argues that information from the DSM-IV as to the nature of Ms. Allen's diagnosis is outside of the administrative record and should not be considered by the Court. (Docket No. 23 at 4.) However, Sedgwick's own form requires that a physician use DSM-IV criteria (Docket No. 18-1 at 20), and interpreting the record requires consultation of the DSM-IV, *see Campbell v. Fortis Benefits Ins. Co.*, 116 F. Supp. 2d 937, 943 (M.D. Tenn. 2000) (using DSM-IV to interpret diagnosis of Major Depressive Disorder), *aff'd sub nom.*, *Hildebrand v. Fortis Benefits Ins. Co.*, 70 Fed. App'x 798, 801 (6th Cir. 2003) (noting that district court made finding using "the more medically precise terminology of the DSM-IV"). Furthermore, the Sixth Circuit has taken judicial notice of an earlier version of the DSM as an appropriate standard for evaluating mental health problems. *See United States v. Johnson*, 979 F.2d 396, 401 (6th Cir. 1992); *see Gough*, 2003 U.S. Dist. LEXIS 25252, at *6 (granting plaintiff's motion for judicial notice of the DSM-IV in an ERISA case and citing *Johnson*). It is not the role of the court to diagnose medical conditions, but the court will reference the DSM-IV to the extent necessary to interpret the record and evaluate the reasonableness of AT&T's decision to deny Ms. Allen's claim for short-term disability benefits. *See Gough*, 2003 U.S. Dist. LEXIS 25252, at *6.

The Plan requirement that Ms. Allen provide medical documentation of her condition does not include the provision of a job description. (Docket No. 20-1 at 12, 38.) Sedgwick's conclusion that the medical information it received did not establish Ms. Allen's inability to perform her job as an area manager of circuit provisioning was arbitrary because it did not take into consideration any of the required functions of Ms. Allen's job. *See Elliott*, 472 F.3d at 613 (ruling that an administrator's broad statement that it considered a claimant's job description does not suffice as evidence of a reasoned determination).

16

In *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003), the Supreme Court held that courts may not apply a "treating physician" rule to ERISA cases. Thus, an administrator need not give more credit to the opinions of a treating physician than to those of a plan consultant. *Id.* at 834. However, "[a]lthough the opinions of treating physicians are not entitled to special deference in the ERISA context, a plan administrator 'may not arbitrarily refuse to credit a claimant's reliable information, including the opinions of treating physicians.'" *Leffew v. Ford Motor Co.*, 258 Fed. App'x 772, 780 (6th Cir. 2007) (quoting *Black & Decker*, 538 U.S. at 833-34).

An independent physician advisor who has been requested to contact a treating physician does not have to "wait indefinitely for a response from a claimant's treating physicians." *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 168 (6th Cir. 2007). However, the independent physician advisor "does have to wait a reasonable amount of time and establish that the treating physicians were informed of the importance to their patient of a prompt reply." *Id.* at 169. In *Cooper*, the Sixth Circuit considered an independent physician who received a file with a period of ten days for review. *Id.* at 168. The independent physician unsuccessfully attempted to contact two treating physicians twice over a period of four days and filed his report on the fifth day. *Id.* The court found that "[the physician's] haste to complete his report in disregard of his explicit instructions to interview [claimant's] treating physicians was unreasonable, especially because he allowed so little time before he 'pulled the trigger.'" *Id.*

Here, the March 5 benefits denial letter emphasized the insufficiency of the evidence provided by a single visit with Dr. Van Orden, without discussing the records provided by Dr. Lancaster. The record does not show that Dr. Grimes attempted to contact Dr. Lancaster or

17

reviewed his findings, and the March 5 benefits denial letter does not mention Dr. Lancaster. However, as of March 5, Sedgwick possessed records from Dr. Lancaster. Thus, Sedgwick unreasonably disregarded reliable evidence from a treating physician. *See Black & Decker*, 538 U.S. at 833-34. Furthermore, Dr. Grimes' attempt to speak with Ms. Fry was minimal, and her haste to "pull the trigger" was unreasonable in light of her assigned task of a peer review and conclusion that the available evidence was insufficient. *See Cooper*, 486 F.3d at 168.

A court must consider potential conflicts of interest as a factor in its evaluation of an ERISA case. *Glenn*, 128 S. Ct. at 2346. Conflicts may exist directly, as when a plan administrator both evaluates claims for benefits and pays benefits, *see id.*, or, more indirectly, as when a company is inclined to contract with an administrator more likely to deny claims, *id.* at 2350. Furthermore, "[w]hen a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism," because of the possibility of a conflict of interest. *Kalish*, 419 F.3d at 507 (quoting *Moon*, 405 F.3d at 381-82). Whether a doctor has an "incentive" to make a finding that a claimant is not disabled is "a factor in determining whether the plan administrator acted arbitrarily and capriciously in deciding to credit the opinion of its paid, consulting physician." *Id.* (citing *Black & Decker*, 538 U.S. at 832).

Dr. Grimes' note reports that Dr. Van Orden suggested Ms. Allen had only seen Ms. Fry once in the three weeks prior to her visit with Dr. Van Orden and concludes "[t]here is some indication that she might not be actively engaged in [treatment]. She reportedly saw her therapist 3 weeks prior to her [initial office visit] with the psychiatrist. Ongoing psychotherapy at least 2x/month is the standard of care for an impairing condition." (Docket No. 18-1 at 182.)

18

In fact, Ms. Allen had first reported absent from work and seen Ms. Fry on February 12, she had seen Dr. Lancaster on February 25, and, finally, Dr. Van Orden on February 28. Dr. Van Orden's form confirms that Ms. Allen's appointments with Ms. Fry were biweekly. Thus, Dr. Grimes did not accurately reflect the record when she stated that Ms. Allen was not following a treatment plan consistent with a disability. Furthermore, in an email sent after Ms. Allen's appeal, Dr. Van Orden denied using the word malingering and reaffirmed his certainty in his diagnosis:[11]

> [My] only concern at that time was that you seemed to be much more interested in a disability evaluation than in treatment; I appreciate that, and [I] think "malingering" is a term the evaluator used but not the way I described your case . . . . I did talk to the [independent physician advisor]. As above, you DEFINITELY have a clear case of Major Depression, as my reports have stated. It is therefore NOT CORRECT to say you do not have a bona fide psychiatric disorder. Further, Ms Fry has documented your poor functional abilities in her notes. How this affects job performance is beyond my ability to predict, as is any statement about ability to do a different job. I agree with Ms Fry that you should file a second appeal.

(Docket No. 18-1 at 117.) Thus, while Dr. Van Orden did express some concern over Ms. Allen's eagerness to document her disability, he did not undermine his own diagnosis. Dr. Van Orden's email suggests that Dr. Grimes' peer review notes were inaccurate or biased reflections of Dr. Van Orden's diagnosis and related comments. Sedgwick's decision to credit the opinion of its paid, reviewing psychologist over that of Dr. Van Orden may be indicative of a potential

---

[11]Although not part of the administrative record at the time of the final determination, this information falls within the exception permitting the court to consider additional information that may reveal a bias or procedural flaw. *See Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed. App'x 495, 508 (6th Cir. 2008) (noting that, according to a treating physician's subsequent deposition, an independent expert mischaracterized the treating physician's comments and finding for the claimant).

19

conflict of interest and is a factor that must be weighed in determining whether Sedgwick's denial was arbitrary and capricious.

Sedgwick determined that Ms. Allen's depression did not prohibit her from performing the functions of her job without any consideration whatsoever as to what those functions were. Sedgwick refused to credit the opinions of Ms. Fry and Dr. Lancaster and did not even discuss their opinions in its initial disability determination. Instead, it relied on the opinion of Dr. Grimes, a retained psychologist who "pulled the trigger" before speaking with two of the three care providers who had opined that Ms. Allen was unable to work. Thus, the initial decision to deny benefits was arbitrary and capricious.

**III.    Sedgwick's Determination to Deny Ms. Allen's Appeal was Arbitrary and Capricious**

On May 8, 2008, Sedgwick notified Ms. Allen that it would uphold the denial of benefits. The letter notifying Ms. Allen discussed information provided by Ms. Fry, Dr. Lancaster, Dr. Van Orden, and two independent physician advisors hired by Sedgwick. Like the initial determination, Sedgwick's evaluation on appeal failed to consider Ms. Allen's job description, and thus failed to make the appropriate inquiry in determining her disability. Although Dr. Greenberg broadly noted that "there is insufficient information to support any negative impact on Ms. Allen's ability to function at her job" as a result of a psychiatric disorder (Docket No. 18-1 at 88), this conclusion, like that of Dr. Grimes, lacks persuasive force in the absence of any evidence that Dr. Greenberg considered the specific requirements of Ms. Allen's job. *See McDonald*, 347 F.3d at 172 (noting that a physician's opinion that a claimant can return to work, without information as to what kind of work he or she performs, is not enough to substantiate a denial of disability benefits). Sedgwick contends that its decision was based on the relatively

20

mild severity of Ms. Allen's symptoms, but Sedgwick did not consider Ms. Allen's symptoms in conjunction with her job description. *See Elliot*, 473 F.3d at 619 ("The proper inquiry is whether [claimant] could perform her own occupation. [Reviewing physician] never undertook such an inquiry"). Thus, as with its initial determination, Sedgwick failed to perform the proper inquiry in its evaluation of Ms. Allen's appeal.

Moreover, it appears that Sedgwick favored the opinions of consultants hired by Sedgwick who found that Ms. Allen was not disabled, despite the fact that the consultants had not examined Ms. Allen. The letter rejecting Ms. Allen's appeal states that there is no objective evidence of any condition that would qualify Ms. Allen for disability. Although requiring a claimant to provide objective evidence of a disability is not unreasonable, *Cooper*, 486 F.3d at 166, both Dr. Lancaster and Ms. Fry reported objective observations of unstable mood. Specifically, Dr. Lancaster noted "[a]ffect tearful, thought processes fragmented, tremulous during visit." (Docket No. 18-1 at 28.) Dr. Greenberg's notes on Dr. Van Orden's records reflect that he considered it unclear whether Dr. Van Orden's characterization of Ms. Allen's "very irritable, unstable mood" was a subjective self-characterization by Ms. Allen or an objective observation by Dr. Van Orden. However, Dr. Van Orden reported this as an objective observation; he reported this characterization in the "impulse control" prompt of the "behavioral observations" section of the disability form, which also contained prompts such as "appropriate dress and hygiene in session," rather than in the section for a patient's self-report of his or her symptoms. (Docket No. 18-1 at 24.) In addition, Dr. Greenberg's review notes suggest that Dr. Van Orden "was not sure how impaired Ms. Allen was," when, in fact, Dr. Van Orden's notes

indicate that he was only uncertain as to when she would be well enough to return to work. (Docket No. 18-1 at 87.) Dr. Greenberg's reliance on Dr. Grimes' notes – which were not reliable representations of Ms. Allen's medical records – may have contributed to the inconsistency between Dr. Greenberg's file review and Ms. Allen's physicians' treatment notes. Sedgwick unreasonably credited Dr. Greenberg's inconsistent opinion over the opinions of Ms. Allen's treatment providers.

Further, Dr. Greenberg's conclusion that there were no objective indications of bona fide psychiatric disorder, which was based on the treating physicians' notes, is difficult to reconcile with the treating physicians' diagnoses and also supports the determination that the evaluation of Ms. Allen's appeal was arbitrary and capricious. *See Heffernan v. Unum Life Ins. Co. of Am.*, 101 Fed. App'x 99, 101-3, 108 (6th Cir. 2004) (finding denial of benefits arbitrary and capricious when the examining physicians unanimously found the claimant to be disabled but a reviewing physician decided that claimant was not disabled based on a lack of objective evidence). Dr. Lancaster diagnosed Ms. Allen with reactive depression, moderately severe, and referred her to Dr. Van Orden, who concluded that Ms. Allen had Major Depressive Disorder. (Docket No. 18-1 at 20, 28.) Dr. Van Orden recommended weekly psychotherapy, increased the dosage of her antidepressant, and scheduled another visit in two weeks. (*Id.* at 20.) Dr. Greenberg described the treatment plan as "neither appropriate nor standard," in that it did not provide for assistance with arranging care for Ms. Allen's mother, but, shortly thereafter, noted that the "actual treatment plan by therapist is not clearly described." (*Id.* at 84.) Similarly, Dr. Greenberg paradoxically found that Ms. Allen's psychiatric medication regimen appeared

appropriate, but concluded that she did not appear to have a bona fide psychiatric disorder.[12]  (*Id.* at 84, 88.)

Neither Dr.Greenberg nor any other medical professional consulted by Sedgwick discusses Ms. Allen's GAF score, requested by Sedgwick on its disability evaluation form.  The score provides a numerical assessment of a patient's overall level of functioning as determined by a physician's observations.  Ms. Allen's score indicated behavior influenced by hallucinations or delusions or inability to function in all areas or serious impairment in communications and judgment.  Despite having requested the score in its disability form, Sedgwick pronounced Ms. Allen capable of performing her job's essential functions without any discussion of the score.  In doing so, Sedgwick unreasonably disregarded a treating physician's opinion despite a lack of reliable evidence to the contrary.

Dr. Greenberg also mis-characterized Ms. Fry's letters – which he describes as the only objective evidence of disability – as documenting a condition which was only observed on one or two days.  At the time of Dr. Greenberg's review, however, the record showed that Ms. Allen saw Ms. Fry on a weekly basis, and Ms. Fry's letters state that, over time, Ms. Allen "has deteriorated further," "she has to be frequently redirected to remain on task," and "she can follow two of a three step command."  This evidence suggests that Ms. Allen's poor performance was not merely a one – or two – day event.  Thus, characterizing Ms. Fry's objective observation

---

[12]Prior to her claim for disability, Ms. Allen took 5 milligrams of an antidepressant (citalopram, brand name Celexa) daily.  (Docket No. 18-1 at 26.)  Dr. Lancaster increased this dose to 10 milligrams daily on February 19 (*id.* at 28), and Dr. Van Orden increased the dose to 40 milligrams daily on February 28 (*id.* at 20).  On February 19, Dr. Lancaster also wrote Ms. Allen a prescription for an anti-insomnia medication (temazepam, brand name Restoril) (*id.* at 20), which Dr. Van Orden found appropriate (*id* at 28).

23

of Ms. Allen's mental health as an anomalous, isolated incident was inaccurate, and Sedgwick's reliance on that characterization to support the conclusion that there was no objective evidence of bona fide psychiatric disorder was unreasonable. Further, while drawing inferences about Ms. Allen's mental health based on her ability to care for her mother, Sedgwick ignored Ms. Fry's notes about Ms. Allen's inability to shop, pay bills, or clean her residence. This type of selective evaluation undermines the integrity of Sedgwick's review of Ms. Allen's appeal. *See Glenn v. Metro. Life Ins. Co.*, 461 F.3d 660, 672-73 (6th Cir. 2006) (rejecting decision that ignored almost all medical evidence submitted by plaintiff and focused exclusively on an aberration in a check-off form supplied by the treating physician), *aff'd*, 128 S. Ct. 2342 (2008).

A plan administrator's reliance on a file review, as opposed to a physical examination, is not, in itself, improper. *Calvert*, 409 F.3d at 295. However, "the failure to conduct a physical examination – especially where the right to do so is specifically reserved in the plan – may, in some cases, raise questions about the thoroughness and accuracy of the benefits determination." *Id.* The Sixth Circuit has been "unable to credit the conclusions reached in [a] file review when the reviewer based his conclusion that the plaintiff was not disabled on adverse credibility determinations and when the reviewer's conclusions stood in direct conflict with objective medical data in the record." *Bennett v. Kemper Nat'l Servs.*, 514 F.3d 547, 555 (6th Cir. 2008) (citing *Calvert*, 409 F.3d at 296-97). Mental health claims, in particular, require physicians to make credibility determinations based on an examination. *See Smith v. Cont'l Cas. Co.*, 450 F.3d 253, 263 (6th Cir. 2005). As recently stated by the Sixth Circuit:

> Courts discount the opinions of psychiatrists who have never seen the patient for obvious reasons. Unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms . . . . [W]hen a

24

psychiatrist evaluates a patient's mental condition, "a lot of this depends on interviewing the patient and spending time with the patient," . . . a methodology essential to understanding and treating the fears, anxieties, depression, and other subjective symptoms the patient describes.

*Bayer*, 275 Fed. App'x at 508 (quoting *Sheehan v. Met. Life Ins. Co.*, 368 F. Supp. 2d 228, 254-55 (S.D.N.Y. 2005)).

In *Bayer*, the administrator relied on a record review to support the conclusion that a claimant was not disabled by his psychiatric problems, even though the treating physicians, who supplied the records, had concluded the claimant was disabled. *Id.* at 508. The court found that the administrator arbitrarily and capriciously rejected the claimant's evidence by relying on the record review. *Id.* at 509. The administrator had reserved the right to order physical examinations and therapy sessions for the plaintiff, and the court found that "[t]he failure of the administrator to take advantage of that option, especially when faced with a claim of mental and emotional instability" was "puzzling and troubling," and an "obvious shortfall" in the determination process. *Id* at 509. Finally, the court ruled that the administrator's note that the claimant was able to attend a course in real estate and achieve the associated license, divorce, remarry, and move to a different city was irrelevant as to the claimant's disability determination. *Id.* at 507.

Here, the two physicians and counselor who examined and treated Ms. Allen came to a consensus that she was not able to work. Sedgwick used their notes to justify the opposite conclusion. Although *Black & Decker* prohibits courts from imposing on plan administrators "a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation," 538 U.S. at 834, Sedgwick's decision to deny Ms. Allen's appeal was not based on reliable evidence.

Sedgwick's dependence on the mental health evaluations provided by non-treating physicians was unreasonable, especially considering that it had the option to order an independent medical examination. *See Bayer*, 275 Fed. App'x at 508. Sedgwick's decision not to order an independent examination, despite its willingness to make determinations about Ms. Allen's credibility, raises questions about the thoroughness and accuracy of Ms. Allen's appeal determination. *See Calvert,* 409 F.2d at 295. This decision also limited its ability to evaluate her mental health. Because, "unlike cardiologists or orthopedists, who can formulate medical opinions based upon objective findings derived from objective clinical tests, the psychiatrist typically treats his patient's subjective symptoms," Sedgwick had to rely on incomplete proxies for a physical examination to justify its departure from the consensus among Ms. Allen's examining physicians. *Bayer*, 275 Fed. App'x at 508.

For example, the rejection letter responding to Ms. Allen's appeal states that, according to Dr. Greenberg, "the circumstances surrounding your presentation appear to reflect conflict between your job and caring for your mother but do not appear to represent bona fide psychiatric disorder." (Docket No. 18-1 at 96.) Similarly, in its motion for judgment, Sedgwick suggests that the "close temporal proximity of Plaintiff's claimed disability absence to an absence to care for her mother certainly gives one reason to wonder, especially since Plaintiff mentioned her disability claim when she first visited her treating physician." (Docket No. 23 at 8.) Sedgwick's insinuations that Ms. Allen's condition was caused by stress related to her job and her ill mother, rather than depression, are baseless, particularly considering that the only physicians to advance such a possibility never examined Ms. Allen. *See Bayer*, 275 Fed. App'x at 509 ("insinuations that [claimant] left work because of conflicts with his boss or his ex-wife" are not reliable

26

evidence of competency to perform work). In addition, although Dr. Chao interviewed Dr. Lancaster and narrowly concluded that Ms. Allen was not disabled due to any internal medicine-related condition, Ms. Allen had not applied for disability benefits based on any such condition, and therefore Dr. Chao's conclusions as to Ms. Allen's potential internal-medicine problems have no bearing on her depression-based disability claim.

Sedgwick denied Ms. Allen's appeal because "the medical information provided did not support the severity of [a] condition that would preclude [her] from performing the essential functions of [her] job." (Docket No. 18-1 at 97.) This conclusion, without any information as to the essential functions of Ms. Allen's position, is irrational. Furthermore, to the extent that Sedgwick relied on record review, it unreasonably relied on only those portions of the record that supported denial of benefits and mischaracterized the observations of Ms. Allen's treating physicians. Finally, Sedgwick used unfounded credibility determinations to justify its conclusions about Ms. Allen's mental health. Thus, Sedgwick's decision to deny benefits on appeal was arbitrary and capricious.

## CONCLUSION

For the reasons discussed herein, the Motion for Judgment filed by the plaintiff will be granted, and the Motion for Judgment filed by the defendant will be denied.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge

27